# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-2008

_____

United States of America

*Plaintiff - Appellee*

v.

Alphonso Wynn

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: January 15, 2016
Filed: July 1, 2016

_____

Before LOKEN, GRUENDER, and KELLY, Circuit Judges.

_____

LOKEN, Circuit Judge.

In August 2014, Alphonso Wynn worked for the Veterans' Administration (now the Department of Veterans Affairs) as a housekeeping aid at the V.A. hospital in Little Rock, Arkansas. On August 24, Wynn called a V.A. Crisis Hotline and said he had a gun and was going to shoot his supervisor due to work-related issues. Wynn was subsequently charged and convicted of transmitting a threat to injure through interstate communications, 18 U.S.C. § 875(c), and threatening a federal employee

with intent to retaliate, 18 U.S.C. § 115(a)(1)(B). The district court[1] imposed a sentence of time served after an in-depth sentencing hearing. Wynn appeals both convictions, raising numerous issues.

We conclude that the district court's jury instruction defining the elements of an § 875(c) offense, though consistent with then-governing Eighth Circuit precedent, omitted the mens rea element now required by the Supreme Court's recent decision in Elonis v. United States, 135 S. Ct. 2001 (2015). The government conceded this issue and advised at oral argument that it does not seek a new trial of this charge if the § 115(a)(1)(B) conviction is affirmed. We conclude that § 115(a)(1)(B) applied to Wynn's threats to assault or murder his supervisor; that the jury was properly instructed regarding the mens rea element of this offense; and that the evidence was sufficient to convict. We reject Wynn's contentions that the district court committed errors relating to his entrapment defense, and plain error regarding an alleged patient-psychotherapist privilege. Accordingly, we affirm the § 115(a)(1)(B) conviction and remand with instructions to vacate the § 875(c) conviction.

## I. Background.

On the day in question, Andrew Horton and Albert Moore were Foremen of Housekeeping Aids in the hospital's Environmental Management Services department, with supervisory authority over Wynn. When Wynn arrived at work, he expressed frustration to Horton over not receiving more overtime shifts. Horton testified that he told Wynn, "whatever it is that's agitated you or [is the] problem here, that's the past, and we can't change the past. So just do the best you can do for today." Moore saw Wynn shortly thereafter and heard Wynn say that "he was going to get his .357 [revolver] and blow him away." Moore responded: "Please don't say

---

[1]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.

-2-

anything like that, because that kind of talk we can't tolerate around here. And if you say it again, I've got to do something about it."

At about eight a.m., Wynn complained to Horton that a coworker had received overtime. Horton replied, "I have nothing to do with that, and neither should you, because this is something that's completely out of our hands. . . . Let it go. Go back to work." Wynn returned to Horton, dropped his keys on the desk, and said, "Look, I'm through for the day. I can't work anymore." Horton told Wynn he was needed and if he left work he would be reported as absent without leave ("AWOL"). Wynn said something to the effect of "so be it" and left. Horton reported Wynn AWOL.

Shortly thereafter, Wynn went to the V.A. hospital's emergency room. James Alexander, R.N., testified that Wynn complained that he was too stressed to work and that his supervisors were going to report him AWOL. David Schmidt, M.D., testified that Wynn did not appear to be suffering from stress and did not report harmful ideations. Dr. Schmidt told Wynn to take the day off and return for an outpatient psychiatric appointment the following day. At Dr. Schmidt's request, Nurse Megan Taylor gave Wynn work-release and discharge notes, which reported a diagnosis of stress and provided information on how to follow up and the Hotline phone number.

At about four p.m., Wynn called the Hotline multiple times. Two nurses working in the acute psychiatric unit of the V.A. hospital in North Little Rock responded to Wynn's calls. Nurse Kristen Kemp, who answered the first two calls, testified that Wynn said he "was really stressed-out[,] that he wanted to inflict harm on his supervisor because he was unable to take sick leave and they were going to give him AWOL," and that Wynn was specific that "[h]e wanted to kill his supervisor." According to her notes, Wynn told her: "I went outside [the V.A. hospital] for a couple of hours and waited for [my supervisor] to come out and I had a gun." She testified that Wynn said he "want[ed] to pop a cap in him, bang-bang, pow-pow." Although Kemp does not report most Hotline calls, she called the police

because Wynn would not calm down, refused treatment, had a specific target, and had the means to carry out his threat.

Wynn soon called the Hotline again. Nurse Thomas Boyd responded. According to notes Boyd made during the call, Wynn stated, "I'm sitting here with a gun in my face and I don't care anymore. I'm not suicidal but I will shoot the hell out of somebody." Boyd told Wynn to go to the emergency room. Wynn refused, then stated, "I needed a day off work [due to] stress and when I told my supervisor this, he put me as AWOL. I am going to shoot the hell out of that mother fucker. I might just come back up [to the V.A. hospital] now." Boyd notified police of Wynn's location, which Wynn stated during the call.

## II. The 18 U.S.C. § 875(c) Conviction.

Section 875(c) provides that "[w]hoever transmits in interstate or foreign commerce any communication containing any threat . . . to injure the person of another, shall be fined under this title or imprisoned not more than five years." In Elonis, the Supreme Court held that a violation of this criminal statute requires proof of a mental state that separates wrongful from innocent conduct, a requirement that applies "to the fact that the communication contains a threat." 135 S. Ct. at 2011. Wynn argues that the district court's pre-Elonis instruction did not include this intent element, and the § 875(c) conviction must be reversed because he preserved the issue.

The government concedes the jury instruction was erroneous under Elonis, which applies as the case is on direct appeal, but argues the error was harmless given the overwhelming evidence of Wynn's intent to threaten. See Neder v. United States, 527 U.S. 1, 15 (1999) ("[T]he omission of an element [from the jury instructions] is an error that is subject to harmless-error analysis."); United States v. Carlson, 787 F.3d 939, 947-49 (8th Cir. 2015); United States v. Cacioppo, 460 F.3d 1012, 1025 (8th Cir. 2006). Wynn argues instruction error that "impermissibly alters the

-4-

prosecution's burden of proof" is never harmless, a contention rejected in <u>Neder</u>. Alternatively, he argues that the trial record contains little evidence of Wynn's intent, and certainly not overwhelming evidence. The government replies that, if the evidence of intent to threaten was not overwhelming, it was at least sufficient to warrant a new trial. Wynn counters that the government does not deserve a new trial because it "effectively waived any argument that the evidence adduced at trial was sufficient" by having evidence of Wynn's subjective intent excluded through a motion *in limine*, citing <u>United States v. Burks</u>, 437 U.S. 1 (1978).

These harmless error issues are complex. However, the government stated at oral argument that it agrees to the vacating of Wynn's § 875(c) conviction if we affirm his § 115(a)(1)(B) conviction. Accordingly, we turn to that issue.

## III. The 18 U.S.C. § 115(a)(1)(B) Conviction.

Section 115(a)(1) provides that "[w]hoever . . . (B) threatens to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, *or an official whose killing would be a crime under [18 U.S.C. § 1114] . . .* with intent to retaliate against such official, judge, or law enforcement officer on account of the performance of official duties, shall be punished as provided in subsection (b)." (Emphasis added.) Section 1114 makes it a federal offense to kill or attempt to kill "any officer or employee of the United States or of any agency in any branch of the United States Government . . . while such officer or employee is engaged in or on account of the performance of official duties." Count One of the indictment charged that Wynn "did threaten to assault, murder and retaliate against an employee of the [V.A.] on account of the performance of his official duties." Wynn challenges his conviction for violating this statute on a number of grounds.

**A. Was Supervisor Horton a Protected "Official"?** Wynn argues that the person he threatened -- Horton -- is not protected by § 115(a)(1)(B) because, as a

Foreman of Housekeeping Aids at a V.A. hospital, Horton was not a federal "official." The district court denied Wynn's motion to dismiss Count One, relying on United States v. Bankoff, 613 F.3d 358 (3d Cir.), cert. denied, 562 U.S. 1086 (2010), the only circuit court decision that has considered this issue.[2] We review the district court's interpretation of the statute de novo. See, e.g., United States v. Markert, 732 F.3d 920, 925 (8th Cir. 2013).

In describing the persons protected, § 115(a)(1)(B) uses the word "official" twice: first, "a United States official," and second, "an official whose killing would be a crime under [§ 1114]." The first use, "United States official," was specifically defined in § 115 as "the President, President-elect, Vice President, Vice President-elect, a Member [or Member-elect] of Congress, [the head of an executive branch department], or the Director of the Central Intelligence Agency." § 115(c)(4). When a different meaning was intended for the second use of the word in the same subsection, the context strongly suggests that this different meaning will also be specifically defined, and it was -- by a cross reference to the universe of federal "officials" covered by § 1114. As the first use of "official" was narrowly defined, Congress would presumably recognize that leaving the second use undefined would risk violating the Fifth Amendment requirement that a criminal statute not be "so vague that it fails to give ordinary people fair notice of the conduct it punishes." Johnson v. United States, 135 S. Ct. 2551, 2556 (2015).

In Bankoff, after reviewing the complex history of this strangely-worded statute, the Third Circuit concluded "that when § 115's reference to an 'official whose

---

[2]The Seventh Circuit upheld a § 115 conviction for threatening federal employees covered by § 1114 without addressing this issue. See United States v. Cash, 394 F.3d 560, 561 (7th cir. 2005) (threatening V.A. service representative); see also United States v. Wolff, 370 F. App'x 888, 895 (10th Cir. 2010) (stating that the similarly worded 18 U.S.C. § 876(c) "incorporates Section 1114's definition of a government official or employee").

killing would be a crime under' § 1114 is read in context, the meaning is plain; 'official' is not used as a term of limitation, but as a general term that incorporates by reference all the individuals protected under § 1114, both 'officer[s] and employee[s].'" 613 F.3d at 370 (alterations in original). Wynn urges us to reject the Third Circuit's interpretation, arguing that by choosing the word "official," which is narrower than the words "employee" or "person," Congress limited the cross reference in § 115(a)(1)(B) to fewer than all the persons identified in § 1114. If Congress intended to include all federal officers and employees listed in § 1114, Wynn reasons, "it could have explicitly said so, or merely used the word 'person' in place of 'official' when it drafted § 115," quoting United States v. Fenton, 10 F. Supp. 2d 501, 503-04 (W.D. Pa. 1998), a district court decision explicitly overruled by Bankoff.

Like the Third Circuit, we turn to the history of these statutes. Section § 1114 when first enacted in 1934 protected a limited universe of federal law enforcement personnel, but Congress over the years greatly expanded the list of protected federal employees. See United States v. Feola, 420 U.S. 671, 679 n.15 (1975). When Congress enacted § 115 in 1984,[3] it "applied only to threats against the family members of federal officials. In 1986, § 115 was amended to extend protection to the officials themselves." Bankoff, 613 F.3d at 371 n.13 (quoting the 1986 legislative history). The 1986 amendment retained the family member prohibition as § 115(a)(1)(A). This evolution explains both the current title of § 115 -- "Influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member" -- and the terminology in listing protected persons in § 115(a)(1)(B), which mirrors the original language of the family-member prohibition now found in § 115(a)(1)(A).

---

[3]Act of Oct. 12, 1984, Pub. L. No. 98-473, § 1008, 98 Stat. 1837, 2140.

When Congress enacted § 115 in 1984, § 1114 covered a long list of federal personnel that included "any officer or employee of the Veterans' Administration assigned to perform investigative or law enforcement functions." Bankoff, 613 F.3d at 368 n.9. "Congress did not shorten this list until 1996 -- twelve years after it enacted § 115 -- when it amended § 1114 to refer simply to 'any officer or employee of the United States or of an agency in any branch of the United States Government.'" Id. at 369. The Third Circuit concluded:

> that Congress used "official" in § 115 as a general term to incorporate by reference all the "officers," "employees," "members," and "agents" of the federal departments and agencies listed in § 1114. By doing so, Congress avoided the need to restate the lengthy list in § 115 itself. . . . Moreover, we think it implausible that Congress used the term "official" as a limitation on the persons enumerated in § 1114, yet declined to define that term or provide any indication as to how courts (or, presumably, juries) were to determine which of the enumerated [personnel] listed in § 1114 also qualify as "officials." Id. at 369-70.

Though the interpretive question is not free from doubt, we agree with the Third Circuit's analysis. To be sure, Congress has cross-referenced § 1114 in other statutes using introductory words broader than "official." In 18 U.S.C. § 1201(a)(5), Congress expanded the federal kidnapping crime to include a victim who "is among those *officers and employees* designated in section 1114" in an amendment enacted in the preceding section of the same Title that first enacted § 115.[4] In 18 U.S.C. § 111(a)(1), Congress criminalized offenses committed against "*any person* designated in section 1114," and at the same time amended § 115 but retained § 115's cross reference to "an *official* whose killing would be a crime under [§ 1114]."[5] See also 18 U.S.C. § 119(b)(2)(A) (criminalizing publication of private information of

---

[4]Act of Oct. 12, 1984, Pub. L. No. 98-473, § 1007, 98 Stat. at 2139-40.

[5]Anti-Drug Abuse Act of 1988 § 6487, Pub. L. No. 100-690, 102 Stat. 4181, 4386-87.

"*an individual* designated in section 1114"); 18 U.S.C. § 1521 (criminalizing false claims "against the real or personal property of *an individual* described in section 1114"). But there is nothing in the legislative history of these other statutes, or of the later amendments to § 115 and § 1114, that "suggests that . . . Congress intended to change, or to clarify, the fundamental relationship between" § 115(a)(1)(B) and § 1114. Cf. Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998). As the Third Circuit observed, "that Congress used different language to incorporate § 1114 in different statutes . . . does not, standing alone, demonstrate that it used the term 'official' (as opposed to 'person') in § 115 with the intention of limiting its scope." 613 F.3d at 367 & n.7.

The interpretive problem is aggravated by the fact that the expansion of § 1114 in 1996 to include all federal "officers and employees" made the first three subparts of the persons covered by § 115(a)(1)(B) superfluous, unless the word "official" in the cross reference means fewer than all persons covered by § 1114. This rubs against the "cardinal principle" that a statute should be construed so that, "if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." TWR Inc. v. Andrews, 534 U.S. 19, 31 (2001) (quotations omitted). But the critical question is whether Congress intended to limit the cross reference to § 1114 by using the word "official" *when it enacted § 115 in 1984*. As the Third Circuit explained, the answer to that question is no, taking account of the context of the statute at that time.[6] We conclude that the answer to that question did not change simply because Congress failed to amend or clarify the list of persons covered by § 115 when it expanded the universe of cross-referenced federal employees in § 1114 twelve years later.

---

[6]"[T]he meaning of words depends on their context." Shell Oil Co. v. Iowa Dep't of Revenue, 488 U.S. 19, 25 (1988).

For these reasons, the district court did not err when it denied Wynn's motion to dismiss Count One of the indictment and instructed the jury on the elements of "the crime of threatening retaliation against a federal employee."

**B. Was the Jury Properly Instructed?**  Wynn argues the district court erred in instructing the jury on the elements of Count One because § 115(a)(1)(B), like § 875(c), requires proof of criminal intent to threaten a federal employee.  We disagree.  As the Second Circuit recently explained, § 115(a)(1)(B) "includes both objective and subjective elements:" a true threat to assault or murder a federal employee, and the intent to retaliate against the employee "on account of the performance of official duties."  United States v. Turner, 720 F.3d 411, 420 (2d Cir. 2013), cert. denied, 135 S. Ct. 49 (2014).  "We read into the statute 'only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct.'"  Elonis, 135 S. Ct. at 2010 (quotation omitted).  The district court instructed the jury it must find that Wynn "made a threat to assault or murder an employee of the [V.A.] . . . with intent to retaliate against such employee on account of the performance of official duties."  That intent separated Wynn's "wrongful conduct" from innocent conduct.  The court objectively defined "threat" in another instruction as a "true threat."  There was no instruction error.

**C. Was the Evidence Sufficient To Convict?**  Wynn argues the evidence was insufficient to convict him of violating § 115(a)(1)(B) because there was no evidence that he made his threatening statements to the Hotline nurses with the required intent to retaliate.  Again, we disagree.  It is well established that a "jury may infer intent from circumstantial evidence."  United States v. Pennington, 168 F.3d 1060, 1065 (8th Cir. 1999).  Here, the testimony of the Hotline nurses and other government witnesses regarding the threatening words Wynn used, the manner in which he communicated those threats, and his other contemporaneous actions provided sufficient evidence for a reasonable jury to find that he "made a [true] threat to assault or murder" supervisor Horton "with intent to retaliate against [Horton] on account of

-10-

[his] performance of official duties." See United States v. Williamson, 81 F. Supp. 3d 85, 90-92 (D.D.C. 2015), appeal docketed, No. 15-3018 (D.C. Cir. Mar. 17, 2015).

**D. The Entrapment Defense.** Wynn argues that the district court erred in refusing to instruct the jury on his entrapment defense. A defendant is entitled to an instruction on the affirmative entrapment defense if sufficient evidence exists from which a reasonable jury could find that government entrapped him. See, e.g., United States v. Kendrick, 423 F.3d 803, 807 (8th Cir. 2005) (quotations omitted). At the close of the evidence, the district court denied Wynn's timely request, explaining:

> I don't think that the entrapment defense applies here. The government did not -- no one from the government encouraged or solicited or induced Mr. Wynn to make a threat. They did tell him if he needed help, to call the hotline. But I don't think that constitutes entrapment.

We review the denial of a requested entrapment instruction *de novo*. United States v. Young, 613 F.3d 735, 743-44 (8th Cir. 2010), cert. denied, 562 U.S. 1159 (2011).

"[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct." Mathews v. United States, 485 U.S. 58, 63 (1988). To warrant an instruction, a defendant alleging entrapment must "show that the government agents implanted the criminal design in his mind and induced him to commit the offense." Kendrick, 423 F.3d at 867 (quotations omitted). Wynn argues the evidence that Nurse Taylor provided him with the Hotline telephone number was sufficient evidence of government inducement to submit his entrapment defense to the jury. Like the district court, we disagree.

Taylor was a medical professional providing resources to help V.A. patients handle medical emergencies, not a law enforcement officer engaged in criminal detection or prosecution. Nurse Kemp testified that the Hotline exists so that "if a

veteran becomes suicidal, homicidal, or [experiences] any kind of crisis, they can call us and try to get help. We try to help them." Taylor and the Hotline nurses did not induce Wynn to use the Hotline to make criminal threats. At most, Taylor provided Wynn information that gave an opportunity to make threats that violated § 115(a)(1)(B). "[E]vidence that Government agents merely afforded an opportunity or facilities for the commission of the crime would be insufficient to warrant [an entrapment] instruction." Mathews, 485 U.S. at 66. "Entrapment occurs only when the criminal conduct was the product of the *creative* activity of law-enforcement officials." Sherman v. United States, 356 U.S. 369, 372 (1958) (quotation omitted; emphasis in original). The district court did not err in refusing Wynn's request for an entrapment instruction.

Wynn further argues that the district court erred in denying his motion for a judgment of acquittal because he was entrapped as a matter of law. This contention is without merit. When a defendant requests and is properly denied a jury instruction because no reasonable jury could find entrapment, as in this case, it is clear that the trial record did not establish entrapment as a matter of law.

**E. The Patient-Psychotherapist Privilege Issue.** Finally, Wynn argues for the first time on appeal that his § 115(a)(1)(B) conviction violated the patient-psychotherapist privilege because it was based on "statements made to the VA nurses during calls to the VA Crisis Line . . . in the context of [Wynn's] attempt to comply with the directive of Nurse Taylor to call the hotline if he experienced 'suicidal or homicidal ideations.'" Wynn is correct that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure." Jaffee v. Redmond, 518 U.S. 1, 15 (1996). However, "[t]he party asserting the psychotherapist-patient privilege has the burden of showing . . . that the communications at issue were made: (1) in confidence, (2) between the patient and a licensed psychotherapist, and (3) in the course of diagnosis or treatment." Weinstein's Federal Evidence § 504.09[2][a] (footnote omitted). Here,

-12-

the privilege did not apply to the communications in question because (1) there was no evidence that any of the nurses were licenced psychotherapists, see United States v. Ghane, 673 F.3d 771, 781-84 (8th Cir.), cert. denied, 133 S. Ct. 477 (2012), and (2) there was no evidence establishing that Wynn made the calls in confidence during the course of diagnosis or treatment. Thus, there was no error, much less plain error. See United States v. Pirani, 406 F.3d 543, 549 (8th Cir.) (en banc), cert. denied, 546 U.S. 909 (2005).

For the foregoing reasons, we affirm the § 115(a)(1)(B) conviction, and we remand with instructions to vacate the § 875(c) conviction and enter an Amended Judgment in a Criminal Case.

_____